**SOUTH STATES OIL & GAS COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 80–1403.

United States Court of Appeals, Fifth Circuit.

Aug. 21, 1981.

Patrick J. Keeley, Michael J. Manning, Fulbright & Jaworski, Washington, D. C., for South States Oil & Gas Co.

Jerome Nelson, Sol., Joanne Leveque, Jane C. Murphy, Robert R. Nordhaus, Gen. Counsel, Joshua Z. Rokach, Washington, D. C., for Federal Energy Regulatory Commission.

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

HENDERSON, Circuit Judge:

South States Oil & Gas Company (hereinafter referred to as "South States") petitions for the review of an order of the Federal Energy Regulatory Commission,[1] issued December 10, 1979, denying relief from its refund obligation and the subsequent order of March 27, 1980, denying a rehearing.

In accordance with the terms of the Natural Gas Act, it is unlawful to sell natural gas in interstate commerce except at just and reasonable rates. Section 4(a), 15 U.S.C.A. § 717c(a). Since 1954 the Commission has regulated the price of gas sold to interstate pipelines by independent producers. *See Permian Basin Area Rate Cases*, 390 U.S. 747, 755–56, 88 S.Ct. 1344, 1353–54, 20 L.Ed.2d 312, 329–30 (1968); *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

In the beginning, the Commission reviewed rate schedules individually, looking to the filing producer's costs to determine whether the prices set in the underlying contracts were just and reasonable. *Permian Basin*, 390 U.S. at 756, 88 S.Ct. at 1354, 20 L.Ed.2d at 330. In 1960 the Commission began to develop new criteria in the regulation of producer prices. Instead of focusing on any single producer, it established a single set of rates for all gas from a producing area. These rates reflected average production costs and a return on investment computed with reference to the risks of exploration and development in the area as a whole. Prices derived under this system are commonly referred to as "area rates."

The Supreme Court approved area rates in the *Permian Basin Area Rate Cases*. What started as an experiment became established practice, and the Commission eventually developed nationwide rates. *See Tenneco Oil Co. v. FERC*, 571 F.2d 834, 837 (5th Cir.), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). *See also* Natural Gas Policy Act, 15 U.S.C.A. §§ 3301–3432 (1981 Supp.) (legislated ceiling prices).

In 1971 rates were promulgated for the Texas Gulf Coast Area. Opinion No. 595, 45 FPC 674; Opinion No. 595–A, 46 FPC 827; 18 C.F.R. § 154.109. On February 23, 1976, after extensive review culminating in judicial approval of the rates, *Public Service Commission for the State of New York v. FPC*, 516 F.2d 746 (D.C.Cir.1975), the Commission ordered numerous producers who had received more than was subsequently found to be the just and reasonable area rate to return to their customers before April 1, 1976, all excess collections subject to refund. *See* Natural Gas Act § 4(e), 15 U.S.C.A. § 717c(e).

South States was ordered to make refunds of certain charges made between January 1, 1961, and September 1, 1968, under three rate schedules, which covered three gas purchase contracts with Tennessee Gas Pipeline Company. On September 8, 1977, South States petitioned for special relief from its refund obligations.[2] This entitlement, it suggested, was justified because of unusually high production expenses. The Commission denied the request, as well as a rehearing. South States then petitioned this court to set aside these orders. On April 29, 1980, we granted South States' motion to stay pending completion of our review.

---

1. The Federal Energy Regulatory Commission assumed most of the duties of the Federal Power Commission on October 1, 1977. In this opinion the term "Commission" refers to one or the other agency according to the date of the action discussed.

2. Tennessee Gas Pipeline Co. intervened in the Commission proceedings but took no position on the relief request.

The Commission denied South States' application because its out-of-pocket operating expenses did not exceed revenues in the area taken as a whole. By this petition for review, South States seeks to reverse the order and require the Commission to consider its capital and other expenses as well as operating expenses, and exclude from the revenue side of the equation production payments South States passed on to previous owners. Failing this, South States would have us hold that the analysis of relief requests must be on a lease-by-lease basis, or that the Commission abused its discretion when it refused to forgo the refund obligation. We decline the invitation and affirm in all respects.

■ South States' entire argument is predicated on its asserted right to a rate that permits recovery of all its costs. We disagree. So long as area rates fairly treat producers as a group, no producer can insist on a rate tailored to his own costs.

Schedule-by-schedule review of gas prices was inappropriate for several reasons. For one, it quickly became apparent that individual review of literally thousands of rate schedules was a staggering task; one which could have consumed all the Commission's resources and time. *Permian Basin*, 390 U.S. at 757–58 and nn. 12 & 13, 88 S.Ct. at 1354–55 and nn. 12 & 13, 20 L.Ed.2d at 330–31. More to the point, the realities of gas production were inconsistent with the assumptions underlying traditional rate-making theory.

Producers of natural gas cannot usefully be classed as public utilities. They enjoy no franchises or guaranteed areas of service. They are intensely competitive vendors of a wasting commodity they have acquired only by costly and often unrewarded search. Their unit costs may arise or decline with the vagaries of fortune. The value to the public of the services they perform is measured by the quantity and character of the natural gas they produce, and not by the resources they have expended in its search; the Commission and the consumer alike are concerned principally with 'what [the producer] gets out of the ground, not ... what he puts into it it ....'

*Id.* at 756–57, 88 S.Ct. at 1354, 20 L.Ed.2d at 330 (footnote omitted; quoting Justice Jackson's separate opinion in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 649, 64 S.Ct. 281, 310, 88 L.Ed. 333, 369 (1944)[3]).

3. Although it did not commence direct regulation of wellhead prices until 1954, the Commission had occasion to consider gas pricing in the proceedings that led to the seminal opinion in *Hope*. Hope Natural Gas Company was engaged in the business of producing, purchasing and selling natural gas in West Virginia. Its rates were subject to Commission regulation because it sold gas at the state line to out-of-state buyers. Following what was then the established pattern of rate regulation, the Commission allowed Hope to earn a return on a rate base reflecting the value of that portion of Hope's property, including gas reserves, devoted to interstate commerce. The case eventually reached the Supreme Court, and the bulk of Justice Douglas' often-cited opinion for the Court is devoted to the weight of consumer interest in the rate calculus, the use of historical costs instead of reproduction costs in computing the rate base and the standards courts should employ in reviewing Commission-set prices.

Justice Jackson wrote a separate opinion, and his suggested regulatory approach was in large part adopted in *Permian Basin*. The opinion shows "The vanity of attempts to apply cost-of-service principles of rate control in complete disregard of value factors ... to the production phase, as distinct from the transmission phase, of the natural gas business." J. Bonbright, *Principles of Public Utility Rates* 167–68 (1961).

The heart of this problem [Justice Jackson wrote] is the elusive, exhaustable, and irreplaceable nature of natural gas itself. Given sufficient money, we can produce any desired amount of railroad, bus, or steamship transportation, or communications facilities, or capacity for generation of electric energy, or for the manufacture of gas of a kind. In the service of such utilities one customer has little concern with the amount taken by another, one's waste will not deprive another, a volume of service can be created equal to demand, and today's demands will not exhaust or lessen capacity to serve tomorrow. But the wealth of Midas and the wit of man cannot produce or reproduce a natural gas field.

*Hope* at 629, 64 S.Ct. at 300, 88 L.Ed.2d at 359. A theory that bases rates on actual costs (or "prudent" costs, *see* Bonbright at 174 n.2), he suggested,

has relative merits in fixing rates for a utility which creates its service merely by its invest-

The Commission did not abandon cost-of-service rate-making with the introduction of area rates.[4] The Supreme Court merely approved a shift of focus from the costs of particular producers to the aggregate costs of all producers. In determining area or national gas the Commission first determines composite cost data for the area, and then allows a risk-adjusted rate of return on average investment. *Permian Basin*, 390 U.S. at 761–62, 88 S.Ct. at 1356–57, 20 L.Ed.2d at 332–33; *Tenneco*, 571 F.2d at 837–38. This approach is beneficial to the entire industry, but may work a hardship on individual producers. The problem with area rates, as was pointed out by the dissent in *Permian Basin*, is that they are based on averages—average costs, average risks and average returns—that bear no necessary relation to the actual costs and risks of any given producer. Thus, low-cost wells will earn relatively more than high-cost wells. Because South States operates high-cost wells, it feels it should be able to charge rates in excess of the area rate.[5]

This is understandable, but unfortunately for South States, the question was resolved in 1968 by the Supreme Court.

*Permian Basin* allows the Commission to concern itself with industry costs instead of individual expenses.[6] 390 U.S. at 768–69, 774–75, 88 S.Ct. at 1360–61, 1363–64, 20 L.Ed.2d at 336–37, 340–41. The Supreme Court reiterated this position in its latest pronouncement on the subject, expressed in *FERC v. Pennzoil Producing Co.* "The Commission is not required by the [Natural Gas] Act to grant special relief from area or nationwide rates simply because the costs of an individual producer increase and his profits decline .... The Commission would not exceed its statutory authority if, in its view of the public interest, it determines to reject requests for special relief presenting no colorable claim that the applicable area or nationwide rate is confiscatory ...." 439 U.S. 508, 518–19, 99 S.Ct. 765, 771–72, 58 L.Ed.2d 773, 782–83 (1979).[7] So long as an area rate passes constitutional muster, as in this case, it would appear that

ment. The amount and quality of service rendered by the usual utility will, at least roughly, be measured by the amount of capital it puts into the enterprise. But it has no rational application where there is no such relationship between investment and capacity to serve. There is no such relationship between investment and amount of gas produced .... The service one renders to society in the gas business is measured by what he gets out of the ground, not by what he puts into it, and there is little more relation between the investment and the results than in a game of poker.

*Id.* at 649, 64 S.Ct. at 310, 88 L.Ed. at 369 (Jackson, J.).

4. *See generally* J. Bonbright, *Principles of Public Utility Rates*, 159–71 (1961) ("The Rate Base: Cost or Value").

5. In actuality, South States has already collected more than the area rates. It only wants to retain these receipts. However, it is only entitled to a just and reasonable price, and a price is not reasonable simply because a buyer is willing to pay it. The just and reasonable rate is the area rate unless South States is entitled to an exception.

In this connection we observe that the failure of South States to prosper under the area rates does not make the Commission's refusal to relieve the refund obligation an abuse of discretion. *See Estate of French v. FERC*, 603 F.2d

1158, 1166 (5th Cir. 1979). Even if the grant of relief in one case were binding precedent in another, the Commission's decision in *Rosario Production Co.* (opinion appended to the Commission brief), upon which South States places substantial emphasis, involves an entirely different situation.

6. Indeed, every exception to the area rate ceilings cuts at their very rationale and tends to impose an unreasonable burden on the consuming public. Area rates already include compensation for the risk that a well will produce very little gas. If exceptions were granted too freely, consumers would suffer overcharges. The price of low-cost gas would be adjusted upward to reflect the average cost of all gas, but the price of high-cost gas would not be adjusted downward. "In sum, all consumers taken together [would] end up paying more than the average of all costs: they [would] pay double for high costs." *PSC of the State of New York v. FERC*, 589 F.2d 542, 560 (D.C.Cir.1978).

7. *See also* 439 U.S. at 517, 99 S.Ct. at 771, 58 L.Ed.2d at 782, quoting *Mobil Oil Corp. v. FPC*, 417 U.S. 283, 308, 94 S.Ct. 2328, 2345, 41 L.Ed.2d 72, 95 (1974) in support of the proposition that "the Commission is not required to adhere 'rigidly to a cost-based determination of rates, much less to one that base[s] each producer's rates on his own costs.'"

an affected producer has no statutory or constitutional right to charge any other rate, at least if the Commission is prepared to consent to abandonment of production. *See Pennzoil,* 439 U.S. at 515, 99 S.Ct. at 770, 58 L.Ed.2d at 780; *Permian Basin,* 390 U.S. at 771, 88 S.Ct. at 1362, 20 L.Ed.2d at 338; *Hope,* 320 U.S. at 652, 64 S.Ct. at 311, 88 L.Ed. at 371 (separate opinion).

South States maintains it is entitled to a rate that covers all its costs, a position we reject. However, the Commission has consistently said that it will grant relief from area rates as an alternative to abandonment, where a producer's out-of-pocket operating expenses exceed its revenues. *See, e. g., Estate of French v. FERC,* 603 F.2d 1158, 1165 (5th Cir. 1979).[8] Even if the Commission did not have to make such concessions, this court has held that "In light of he Commission's own statement [that it would excuse refund obligations "when out-of-pocket operating expenses exceed the income generated at the established rate"], the failure to grant that relief would be an abuse of discretion." *Id.* The Commission has respected its precedent and thus acted within its discretion.

■ The Commission concluded that South States' revenues for the area as a whole exceeded its out-of-pocket operating expenses. We are urged, first, to reject the area-wide approach to special relief and require a lease-by-lease or rate schedule-by-rate schedule examination. South States does not articulate its objection to area-wide review, but since the rate schedule is the basic unit of regulation we can appreciate its point that in considering special treatment requests the Commission should separately compare the costs and revenues associated with each rate schedule. Be that as it may, area-wide review fits with area-wide rate setting, and any other reasoning would be, to some extent, inconsistent with

area rates. *Dorchester Gas Producing Co. v. FERC,* 571 F.2d 823, 830 n.10 (5th Cir. 1978); note 6, *supra.* The Commission has not impressed us with its consistency, *see Dorchester, id.,* but this alone does not justify judicial intervention. *Id.; cf. Estate of French* (standard of review).

■ In computing operating expenses, the Commission excluded production payments made by South States to former owners, *see generally* H. William & C. Meyers, *Manual of Oil and Gas Terms* 389–90, 458 (4th ed. 1976), and did not allow for depletion of reserves or depreciation. This court has previously concluded that these are capital costs that the Commission need not classify as operating expenses in deciding whether to grant relief from area rates. *Estate of French,* at 1165; *Dorchester* at 830, 831.

■ Finally, South States suggests that the nationwide schedules the Commission promulgated in 1975 somehow relieved the refund obligation. The nationwide rate order did not purport to do so, and we must respect the Commission's interpretation of the relationship between these two rate orders. *See, e. g., Gillring Oil Co. v. FERC,* 566 F.2d 1323, 1325 (5th Cir.), *cert. denied,* 439 U.S. 823, 99 S.Ct. 91, 58 L.Ed.2d 115 (1978).

AFFIRMED.

---

8. South States makes much of the Court's observation in *Permian Basin* that the Commission was prepared to grant special relief from area rates in the event of unusual hardship. Even so, the Court also noted that the Commission "emphasized that exceptions to the area rates would not be readily or frequently permit-

ted ...." 390 U.S. at 764, 88 S.Ct. at 1358, 20 L.Ed.2d at 334; *see also id.* at 770–73, 88 S.Ct. at 1361–63, 20 L.Ed.2d at 338–39. In *Pennzoil* the Court stressed that its earlier opinions never meant that individual accommodation was always required. 439 U.S. at 518–19, 99 S.Ct. at 771–72, 58 L.Ed.2d at 782–83.